William GRAY, Respondent,

v.

Tim WHITE, Appellant.

No. ED 74508.

Missouri Court of Appeals,
Eastern District,
Division Three.

Dec. 7, 1999.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 16, 2000.

Case Transferred to Supreme Court
March 21, 2000.

Case Retransferred to Court of
Appeals Oct. 3, 2000.

Original Opinion Reinstated
Oct. 12, 2000.

Tim White, Festus, pro se.

Kurt D. Breeze, Suzan Ponder–Bates, Festus, for respondent.

RICHARD B. TEITELMAN, Presiding Judge.

Louis Timothy White ("Appellant") appeals from a judgment entered in favor of

the City of Festus ("the City") in the City's suit against him for injunctive relief. The City's action alleged that Appellant's operation of an auto sales and service business on the property located at 1601 Horine Road, without erecting a sight-proof fence at the property, constituted a violation of applicable zoning ordinances. It further alleged that Appellant continued to operate the business without proper city or state licensure. The trial court granted injunctive relief. On appeal, Appellant contends that his business has always fully complied with the buffer zone and other requirements of the Conditional Use Permit he was originally granted by the City; that building a sight-proof fence would directly conflict with applicable state law requirements governing automobile display lots and thus make it impossible for him to lawfully use the location as an auto dealer; and finally that the City's refusal to renew his city business license was unlawful and that it caused the loss of his state dealer's license. We reverse and remand.

### *Factual and Procedural Background*

In 1979, Appellant applied for and obtained a re-zoning[1] and then a Conditional Use Permit from the City for his property located at 1601 Horine Road, for the purposes generally of the sale and servicing of antique and classic autos. The property consisted of approximately seven-and-a-half acres in what at that time was a predominantly rural area; the south side of the lot bordered a road. On the opposite side of that road, across from Appellant's property, was land which, although consisting of a large and mostly unimproved hayfield, was zoned R–1 residential. The Conditional Use Permit stated:

> The Board of Adjustment of City of Festus, upon proper application and due consideration, finding no adverse effect upon adjacent property, after consideration of the adjacent uses and structure does hereby expressly authorize and permit the owners, their grantees, assignees, purchasers, and successors in interest in the following motor vehicle sales and services at 1601.

> Specifically, a buffer zone[2] is required on the south side which borders on R–1 District. The Board also authorizes outdoor serving (sic) and storage of vehicles customary to motor vehicles sales and services. All other requirements in the zoning ordinance applicable to this B–3 zone shall be met. Permit issued this 20th day of June, 1979. [Signed by] James T. Lovelace, Chairman of the Zoning Board of Adjustment.

In reliance upon having been granted the Conditional Use Permit ("CUP"), Appellant constructed a building on the property, at a cost of over $30,000. The building was placed toward the back of the lot, in accordance with the City's specifications, leaving the area in front of the building as a storage and display area for the automobiles. After its construction, Appellant, in that same year, applied for an occupancy permit and City Business License for operation of his business. Following inspection by the City Code Enforcement Official, he was granted both. Later that year, he obtained a state auto dealer's license. The business, "Tim White's Auto Sales," was established for

---

1. Prior to the re-zoning, the property in question was zoned R–1. Throughout this litigation, there has been some confusion as to whether it was re-zoned to a "B–2" or "B–3" classification. The city's petition refers to it being in a B–2 area; yet the City admitted in binding answers to requests for admissions that the property was re-zoned to B–3 in 1979, and admitted in court that it had not been re-zoned since then. The property is B–3.

2. "Buffer zone" is defined as an "area of land separating two different zones or areas to help each blend more easily with each other, such as a strip of land between industrial and residential areas." BLACK'S LAW DICTIONARY 194 (7th ed.1999). As will be discussed *infra* herein, interpretation of the meaning of the "buffer zone" requirement of the original Conditional Use Permit has been an issue in this case.

the purpose of buying, selling, servicing and restoring primarily antique and classic automobiles.

The nature of the business consisted primarily of the buying and selling of mostly "project-status" (also known as "pre-restoration") antique and classic cars, along with restoration work done by Appellant for a fee on cars that customers would purchase. Although Appellant would occasionally purchase antique/classic vehicles in good or even pristine condition, his usual method of operation was to purchase such vehicles that were generally dilapidated and in gross need of repair to be brought into a restored and operable condition.

Appellant's business continued uninterrupted for many years without problems. During all of these years, the City annually renewed his City Business License. Although sales volume began to wane somewhat in the early Nineties, Appellant's best years in terms of volume of sales occurred in the mid-Eighties, when he sold upwards of 200 cars per year. Two other changes occurred around that time. First, a new subdivision, with many new residences, developed in the R–1 residential district to the south of Appellant's business. Second, during all of 1993 and most of 1994 Appellant was required to devote a great deal of his time to caring for his fiancée, who had developed a very grave illness from which she eventually died, and consequently during this period Appellant was unable to devote as much time to the business as he had in the past.

Appellant's first indication of problems with the City relative to his business was a letter he received from City Administrator Richard Turley in September of 1993, notifying him that the City had gotten complaints from neighbors about seeing "junk" vehicles stored on his business property and informing him that the original CUP required a "buffer zone on the south side . . . to shield any objectionable material or activity from adjoining property owners." The letter requested a response; it is not clear from the record what, if any, response Appellant made to it.

Appellant continued to operate his business until the City denied his request for a City License in mid–1994. It is undisputed, from answers to requests for admissions given by the City, that the City had annually renewed Appellant's City Business License every year from 1979 until 1994; that during those years Appellant was licensed to carry on a business at that location "similar to" the same business and activities he was conducting there at the time of trial; that the City has no record of failure on Appellant's part to comply with the City's ordinances regarding his property at 1601 Horine Road prior to 1994; and that the City for the first time in 1994 required a sight-proof barrier at that location. The City has further acknowledged, in its own motion for summary judgment, that the original buffer zone requirement of the CUP did not require a sight-proof barrier.

The City, after making demands upon him for a sight-proof barrier on the south side of his lot, refused to renew Appellant's City Business License. The City indicated it had received complaints from residents in the new subdivision across the road on the south side, who objected to the vehicles as being junk in their unrestored stage. There were also complaints regarding some vegetation overgrowth, which Appellant subsequently cleaned up, that had accumulated while Appellant was away from the business. City Building Commissioner Bill Gray (who also serves as the City's Zoning Commissioner) inspected the property following these complaints, made a determination that the lack of a sight-proof fence at the property now constituted a violation of the CUP's original "buffer zone" requirement, and testified at trial that that was the reason the City had refused to renew Appellant's annual City Business License. Near the end of 1994, after the City police chief refused to certify Appellant's application for renewal of his *state* auto dealer's license,

Appellant also then lost his state licensure as well.

Following the City's denial of his 1994 Business License, Appellant continued to conduct business at the 1601 Horine location, though on a more limited basis.[3] The City then sent a series of letters to Appellant, several from the City Attorney and one from the City Administrator, continuing to demand that he erect a sight-proof barrier. The City also urged Appellant to appeal their non-renewal of his business license to the Board of Adjustment. On May 30, 1995, Appellant wrote a letter to the Board of Adjustment requesting a meeting for their consideration of his dispute with the City and, specifically, whether the CUP required a sight-proof barrier. However, he received a reply letter from the Chairman of the Board of Adjustment six days later which stated that Appellant had not followed the proper procedure to request a formal hearing.

■ On December 27, 1995, the City filed a petition in the circuit court of Jefferson County for Injunction to Abate Ordinance Violation. In March of 1996, the City filed an amended petition. The petition cited Appellant's alleged failure to comply with applicable zoning ordinances for failing to satisfy the requirements of the CUP. It alleged that Appellant had "failed to comply with the conditional use of property . . . as an auto sales business and Defendant has refused any attempt to conform to the conditional use allowed in a B2 zone by erecting a sight-proof fence to obscure the stored vehicles." The petition further alleged that Appellant was operating without proper City licensure, in that,

despite numerous requests from the City to "properly conform" his use of the property at 1601 Horine Road, he had refused to do so and was therefore denied a City Business License for use of the property. It further alleged that Appellant "continues to hold out for sale motor vehicles while not pursuing the requisite state license." Appellant filed an Answer to the Amended Petition, as well as a Counterclaim seeking an injunction for a City Business License to issue and damages for loss of business.[4]

Both parties subsequently filed motions for summary judgment. Appellant's summary judgment motion, filed in May of 1997, alleged there was no genuine dispute that he had always complied with the original buffer zone conditions of the CUP. The City's response to Appellant's summary judgment motion argued, in essence, that although a sight-proof barrier was not a condition at the time of the original CUP, the local ordinance under which CUP's were granted required a determination that the allowed business use not adversely affect adjacent properties, and that "due to the changed nature of adjacent uses and structures," a sight-proof barrier was now required for the protection of the general welfare "of adjacent properties." In late September of 1997, the City filed its summary judgment motion. It alleged in general terms non-compliance with zoning ordinances and lack of proper licensure.

On January 30, 1998, the trial court held a hearing on the parties' competing motions for summary judgment. Appellant's counsel indicated that he was withdrawing

---

**3.** Appellant continued to store and sell cars from the location; but he was careful to keep the number of cars sold in his own name to no more than six per year. (State law allows any individual to sell up to six cars per year without being a licensed dealer; see § 301.570 RSMo Cum.Supp.1998.) He also testified that he discontinued any *servicing* of customers' vehicles at the location following denial of his city license, since he believed that continuing to carry on that activity would be unlawful without the city license.

**4.** Although Appellant has neglected to include his Counterclaim in the Legal File, the City, on page 5 of Respondent's brief, has acknowledged it and the relief it requested. Where a statement of fact by one party is conceded to be true in the adversary's brief, we may consider it as though it appears in the record. *Missouri Highway and Transportation Commission v. Sweeney*, 933 S.W.2d 908, 910 (Mo. App. S.D.1996).

his motion, and instead desired a full trial on the merits.

The City chose to argue its motion. Reflecting a noticeable shift in theory from its earlier pleadings, the City did not argue that a sight-proof barrier was required because the applicable conditions of the CUP could change with changing times and circumstances relative to adjacent properties, and instead argued that the reason a sight-proof barrier was now required was because *Appellant's own use* of the property had fundamentally changed. Specifically, the City argued that Appellant was now no longer primarily operating an auto sales or servicing operation, but rather that the property had become a junk yard or scrap yard, and that under Festus ordinance Sec. 23–18——which had never before been cited by the City in any of its pleadings——any individual operating a junk yard or scrap yard is required to maintain a fence around it.

At the summary judgment hearing, the court narrowed the issues for trial pursuant to Rule 74.04(d), and granted partial summary judgment in favor of the City. The court determined that the only issue to be presented at trial was whether or not the use of the property had changed from its original use in 1979 to 1994, when the City denied Appellant's City Business License. Specifically, the court determined that the sole remaining material issue of fact for trial was whether "the character of the place has changed from auto sales to junk yard." The court stated for the record that "if there's no change in the zoning, then the only issue really is whether

there's been a change in [Appellant's] use," and that "if the restrictions are based on the zoning and the zoning hasn't changed, then the issue before the court is is this place a junk yard or is this place a place to sell cars?" On that basis the court read into the record certain findings of fact pursuant to Rule 74.04(d), which were mostly pro forma.[5] The court also found that "Tim White does not have a valid city or state business license at this time, which was claimed by the city and admitted in the affidavit of Mr. White, for whatever reason that he doesn't have it."[6]

Trial was held several days later. Little of the City's evidence directly addressed the "changed-use-to-a-junkyard" theory, although there was limited evidence of reduced volume of sales starting around 1992 or 1993, as well as evidence of some temporary overgrowth of vegetation on the property. Instead, the City's evidence focused on issues such as Appellant's lack of licensure; the City's original determination in 1994, (in response to complaints from residents of the subdivision across the road that the vehicles were an eyesore), that a sight-proof barrier was now required in order to comply with the conditions of the CUP; and Appellant's alleged failure to exhaust administrative remedies after the City had cited that as the reason for refusing to renew his City License. The Appellant testified and presented other witnesses and evidence. He contended he had complied with the conditions of the CUP and that the nature of his business operation and use of his property had not

5. The court found, inter alia, that Festus is a properly incorporated third class municipal corporation; that Mr. Turley was the City Administrator; that Bill Gray was the City's appointed building code official; that the City and its officials were authorized to bring actions to enjoin violations of zoning ordinances and prevent the unlicensed use of business property in Festus; and that the City had filed with the court several of its zoning ordinances and other ordinances it claimed applied to the case, including Sections 31–92, 31–34, 32–18, 23–69, and 26–74 of the Festus City Code.

6. Contrary to the City's argument at trial and in this appeal, and for reasons that will be explained more fully later in this opinion, we conclude the trial court did *not* by this finding hold that Mr. White was illegally engaging in business. Had the court so held it clearly would have been improper to do so at the summary judgment, since Appellant had consistently denied that his limited continued operation of the business at 1601 Horine Road without licensure was unlawful and there were genuinely disputed questions of material fact regarding that issue.

changed over the years. The court also took judicial notice of its entire file in the matter. Parties' counsel were granted time to file post-trial memoranda of law.

On May 5, 1998, the court issued its final Order and Judgment. The judgment stated, in pertinent part:

> The Court finds that there is an existing use authorized by the City of Festus in 1979 to Defendant Tim White for purposes generally of the sale of antique autos and the servicing of the same. Over the years Defendant procured more and more of these antique autos, many of which were junk until restored by Defendant's labor. Defendant continued to acquire these vehicles to sell some of them. Plaintiff City of Festus continued to issue a conditional use permit until 1994 when it declined to renew the conditional use permit after receiving complaints on the south road side from nearby residents who objected to the vehicles as being junk in their unrestored stage. The evidence showed that some vehicles have remained in an unrestored stage for a long enough time that saplings and weeds are growing through them.

> The Court finds that Plaintiff City of Festus has not changed the use or changed the zoning for the area. Rather, due to Defendant's expanded storage of pre-restoration vehicles and the growth of the residential area, the Plaintiff is acting under Section 31–92 of the Code of the City of Festus, which provides: "In considering an application for a conditional use, the board shall give due regard to the nature and condition of all adjacent uses and structures; and in authorizing a conditional use, the Board may impose such requirements and conditions with respect to location, construction, maintenance and operation, in addition to those expressly stipulated in this chapter, for the particular conditional use as the Board may deem necessary for protection of health, safety, morals and the general welfare, and

> for the protection of adjacent properties."

> The Court finds that Plaintiff is acting within its authority in not changing the use, but in requiring a sight-proof fence on the South road side as a condition of the issuance of a conditional use permit.

> The Court grants Defendant 90 days from the date of this order to erect a sight-proof fence on the South road side of the property at 1601 Horine Road, Festus, Missouri and file proof of the completion of same with this Court. If said fence is not completed by August 3, 1998 ... Defendant is enjoined from occupying and utilizing the property at 1601 Horine Road as an automobile storage/salvage facility and servicing and sale of same. Fifteen days is then granted until August 18, 1998 for Defendant to remove all vehicles currently being held on the property. If said vehicles are not removed by that date, Plaintiff is authorized to effect and enforce this order by the seizure and physical removal of said vehicles from the property. Defendant's counterclaim is dismissed. Costs of the action are against Defendant.

Following that judgment the Appellant, Tim White, acting *pro se*, filed this appeal.

### Standard of Review

 Zoning disputes frequently involve contested administrative decisions; and in such cases we review the findings and decision of the administrative agency, not the findings and decision of the circuit court. *Ode v. Board of Zoning Adjustment of Platte County,* 796 S.W.2d 81, 83 (Mo.App. W.D.1990). However, although local zoning ordinances may provide for enforcement by fine or other mechanisms, a court of equity also has power to directly enjoin any use of property which is in violation of a city's ordinances. See *City of Ladue v. Horn,* 720 S.W.2d 745, 747 n. 2 (Mo.App. E.D.1986). When such injunctive relief is sought, the controversy is sometimes presented to the trial court

without either party having first pursued administrative remedies; and in such cases we are generally guided by the scope of review for a court-tried case as set forth in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). See *Taylor v. City of Pagedale*, 746 S.W.2d 576, 577 (Mo.App. E.D. 1987); *City of Ladue v. Horn*, 720 S.W.2d at 748; *City of St. Ann v. Crump*, 607 S.W.2d 706, 707 (Mo.App. E.D.1980). Further, our standard of review would be essentially the same as in *Murphy* even if this case were deemed to be the review of a noncontested administrative case. See *Citizens For Waste Management v. St. Louis County*, 810 S.W.2d 635, 641 (Mo. App. E.D.1991). We therefore conclude that the appropriate standard of review is governed by *Murphy v. Carron*, 536 S.W.2d 30. The judgment of the trial court will be affirmed unless it is not supported by substantial evidence, unless it is against the weight of the evidence, or unless it erroneously declares or erroneously applies the law. *Id.* at 32.

Additionally, we conclude that this standard of review applies to *all* of the issues in this case, not just the question of whether Appellant's use of his property had changed from auto sales/service to junk yard. Notwithstanding certain comments made by the court at the conclusion of the summary judgment hearing to the effect that that would be the only issue considered at trial, the transcript clearly reveals that during the trial the trial court heard and allowed a wide range of testimony and evidence on other related issues, including whether Appellant had complied with the conditions of the CUP, whether he had a valid legal reason for continuing to sell some cars from the 1601 Horine Road location without city or state business licensure, and whether he had exhausted required administrative remedies.

*Analysis*

### I. City's Motions On Appeal

The City has raised two procedural matters that we must address at the outset, the motion to dismiss Appellant's appeal and the motion to strike his "Exhibit H."

The City's motion to dismiss the appeal alleges numerous violations by Appellant of the briefing requirements of Rule 84.04. Some of these alleged violations are relatively minor; others are of more weight. The most serious relate to inadequacies in Appellant's points relied on and in his statement of facts.[7] Although we hesitate to dispose of an appeal for violations of Rule 84.04 because the rules of civil procedure are to be liberally construed to promote justice and minimize the number of cases disposed of on technical grounds, see *Brancato v. Wholesale Tool Co., Inc.*, 950 S.W.2d 551, 555 (Mo.App. E.D.1997), substantial compliance with Rule 84.04 nevertheless is required. *Id.* at 553–54. This principle applies to *pro se* litigants, such as Appellant Tim White, just as much as it does to lawyers. *Id.* at 556. Generally, *pro se* appellants are bound by the same rules of procedure as lawyers, and are not entitled to any indulgences they would not have received had they been represented by counsel. *Id.*

Rule 84.04(d)(1) provides that each point relied on shall "(A) identify the trial court ruling or action the appellant challenges; (B) state concisely the legal reasons for the appellant's claim of reversible error; and (C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error." These requirements are in substance the same as those contained in the version of the rule in effect prior to January 1, 1999, which required the points relied on to "state briefly and concisely what actions or rulings of the trial court

---

7. We do not consider any factual statements in Appellant's statement of facts containing information outside the record received by the trial court. Appellant's deposition testimony may be considered, however, as the deposition was filed with the court by the City and the court took judicial notice of its entire court file.

are sought to be reviewed and wherein and why they are claimed to be erroneous...." The rule is designed to give notice to opposing parties and to the appellate court as to what issues are being presented for review. *Thummel v. King,* 570 S.W.2d 679, 685–86 (Mo. banc 1978). We have the discretion under Rule 84.04 to dismiss an appeal for failure to comply with the rule.

 However, we also have discretion in the interest of justice to review an appeal on the merits even when the statement of facts and points relied on are not acceptable. *Raines v. City of St. Louis,* 711 S.W.2d 544, 544 (Mo.App. E.D.1986). We will not exercise our discretion to dismiss an appeal for technical deficiency under Rule 84.04 unless the deficiency impedes disposition on the merits. *Saidawi v. Giovanni's Little Place, Inc.,* 987 S.W.2d 501, 504 (Mo.App. E.D.1999), citing, *Wilkerson v. Prelutsky,* 943 S.W.2d 643, 647 (Mo. banc 1997). See also *Brown v. Hamid,* 856 S.W.2d 51, 53 (Mo. banc 1993). Although Appellant's points relied on are deficient, we are able to ascertain the issues and arguments. The City's motion to dismiss the appeal is denied.

 The City also has filed a motion to strike Appellant's proffered trial "Exhibit H" from the record on appeal. "Exhibit H" was a letter and accompanying multi-page document mailed to Appellant from the Missouri Motor Vehicle Commission in late 1994, along with the application renewal form for his state auto dealer's license, purporting to explain the various then-current state regulations and requirements that had to be met by someone applying for renewal of a dealer's license. The trial court sustained the City's objection to "Exhibit H" based on hearsay, lack of foundation and failure to authenticate. The transcript shows that Appellant sought to admit this item to show the existence of the state regulation referenced therein which required unencumbered view of an auto dealer's display lot from the nearest public road. The court had previously professed a desire to see any such regulation, but then held that "Exhibit H" was "not the proper way" to introduce it. Although we would arguably be entitled to consider "Exhibit H" under Rule 73.01(c)(3), the City is correct that it was not properly authenticated at trial. The City's motion to strike "Exhibit H" from the Legal File is therefore granted. Nevertheless, the salient state requirements for dealership contained in the document, namely 12 CSR 60–2.120, should be considered by this Court. The courts of this state shall take judicial notice, without proof, of the contents of the code of state regulations. § 536.031.5 RSMo 1994.

## II. *Appellant's First Point On Appeal*

In his first point on appeal, Appellant contends that the court erred in failing to properly preserve certain records from the trial. Specifically, he complains that the court lost his proffered Exhibits "D" and "E." Contrary to the City's argument, review of the transcript shows that these documents were identified in trial testimony. The former purported to be a copy of the original petition for rezoning and CUP that he filed with the Festus Board of Adjustment in 1979. The latter was identified by a witness at trial, who was a current member of the Board of Adjustment and was also a member in 1979, as being the official note cards made by the Chairman of the Board of Adjustment in 1979 concerning the hearings that were held that resulted in the Board's granting Appellant the CUP to use his property for an auto sales/service operation.

However, these exhibits were never introduced into evidence. When Appellant's trial counsel attempted, near the end of the trial, to introduce all previously identified Defendant's exhibits, neither the court nor Appellant's counsel could locate either "D" or "E." Our careful review of the transcript, at pages 80–81 and 137–138, shows that there is no indication that either the court or the court reporter caused their disappearance. Point denied.

### III. *Appellant's Second Point On Appeal*

In Point II Appellant combines what, if they had been properly stated under Rule 84.04, would amount to four separate points on appeal. With respect to the City's **zoning** claim, he contends the trial court erred in entering judgment for the City requiring him to erect a sight-proof fence because (1) as a matter of law Appellant could not be required to erect a sight-proof fence if he had neither failed to comply with the original conditions of his CUP nor fundamentally changed the nature of his business operation; and (2) there was no substantial evidence to support that he had either failed to comply with the CUP or changed the nature of his business from that of an auto sales and service operation to that of a junk yard or salvage facility. He further argues, with respect the issue of whether he lacked proper business **licensure**, that the trial court (3) erred in not finding that the City's failure to renew his City Business License and its refusal to certify his application for renewal of state auto dealer's license was unlawful, and (4) erred in dismissing his counterclaim.

### A. *Zoning Case*

The City's **zoning** case against Appellant, i.e., its claim that he is legally required under local zoning ordinances to erect a sight-proof fence, is based on two theories. The first theory, (which we will refer to as the "living ordinance" theory), is premised on the changed use and changed circumstances that have occurred with regard to the *adjacent properties* in the R–1 district bordering Appellant's property on the south side. That theory asserts that even if the fundamental nature of Appellant's business has not changed over the years, and even though a sight-proof barrier was not a condition of the original CUP, it nevertheless, in order to protect the welfare of the greatly increased number of residential properties in the bordering R–1 district, can now become a required condition of his continuing to do business at that location. The second theory, (which we will refer to as the "changed use" theory), is based on the premise that *Appellant's own use of his property* has changed. That theory argues that the nature of Appellant's business has fundamentally changed from that of an auto sales and service operation to something more closely resembling a junk yard—a use which is not permitted under the CUP. Both theories must be addressed, since in a court-tried case the decree will be upheld under any reasonable theory pleaded and supported by the evidence. *O'Bar v. Nickels*, 698 S.W.2d 950, 955 (Mo.App. S.D.1985).

### (1) *The "Living Ordinance" Theory*

A local Board of Adjustment has the power to grant a CUP. *State ex rel. Nealy v. Cole*, 442 S.W.2d 128, 131 (Mo.App.St.L.Dist.1969). Even though it is in some respects analogous to, a CUP is different from both a nonconforming use and a variance. *One Hundred Two Glenstone, Inc. v. Board of Adjustment of the City of Springfield*, 572 S.W.2d 891, 893–94 (Mo.App. Springfield Dist.1978); see also generally Theodore H. Hellmuth, 18A Missouri Practice, Real Estate Law–Disputes, §§ 1293–1296 at pp. 325–328 (1998). A CUP (also sometimes known as a "special use permit") is "a species of administrative zoning permission which allows a property owner to put his property to a use which the regulations expressly permit under conditions specified in the zoning regulations themselves." *Ford Leasing Development Co. v. City of Ellisville*, 718 S.W.2d 228, 232 (Mo.App. E.D.1986), citing 82 Am Jur.2d *Zoning And Planning* Section 281 at 827 (1976). It allows a land use authorized by a local legislative body and deemed conducive to the general welfare of the community, but which may be incompatible with the basic uses in the particular location in relation to surrounding properties unless certain conditions are met. *State ex rel. Columbia Tower v.*

*Boone County,* 829 S.W.2d 534, 538 (Mo. App. W.D.1992).

A CUP holder who acts in good faith reliance upon a CUP that has been granted to him, by making a substantial investment in erecting a building on the property, *acquires a vested right* in the continued permitted use of that property in a manner that complies with the conditions of the CUP. See *Ford Leasing Development Co. v. City of Ellisville,* 718 S.W.2d at 232. Further, where there is such reliance, and especially where the CUP itself specifically so states——as does the CUP in the case at bar——the CUP owner's vested right to such continued use of the property is transferable and "runs with the land." *Id., Citizens For Waste Management v. St. Louis County,* 810 S.W.2d 635, 642 (Mo.App. E.D.1991). Such a CUP "remains in effect until its provisions are violated." 83 Am Jur.2d *Zoning and Planning,* Section 959 at 803 (1992). A municipality seeking to revoke a CUP has the burden of proving the basis for revocation of the permit. *Nigh v. City of Savannah,* 956 S.W.2d 451, 453 (Mo. App. W.D.1997).

Here, the trial court's judgment found, in pertinent part, that:

[T]he City of Festus continued to issue a conditional use permit until 1994, when it declined to renew the conditional use permit after receiving complaints on the south side from nearby residents who objected to the vehicles as being junk in their unrestored stage. * * * * The Court finds that Plaintiff City of Festus has not changed the [allowed] use or changed the zoning for the area. Rather, due to Defendant's expanded storage of pre-restoration vehicles *and the growth of the [neighboring] residential area,* the Plaintiff is acting under

Section 31–92 of the Code of the City of Festus, which provides, "In considering an application for conditional use, the Board shall give due regard to the nature and condition of all adjacent uses and structures; and in authorizing a conditional use ... may impose such requirements and conditions ... as the Board may deem necessary for the protection of health, safety, morals and the general welfare and protection of adjacent properties." The Court finds that Plaintiff is acting within its authority in not changing the use, but in requiring a sight proof fence on the south side road as a condition of the issuance of a conditional use permit. (Emphasis ours)

The above-cited portion of the judgment clearly embraces what we have previously referred to as the "living ordinance" theory; it is wrong as a matter of law for at least two reasons.

First, the trial court's holding conflicts with the above-discussed fundamental principles of law concerning the nature and duration of a CUP.[8] The record in this case establishes beyond dispute that a sight-proof barrier was not a condition of the original CUP, and that the City did not require a sight-proof barrier at Appellant's property from 1979 until 1994. The court erred in holding that Appellant's CUP is annually reviewable and renewable, or subject to the imposition of new and changing conditions inconsistent with the original CUP, absent Appellant's non-compliance with the original conditions of the CUP. Although the City may have attempted to offer such an argument in its summary judgment motion, there is no support in the record for such a finding. The uncontradicted trial testimony of the one member of the Board of Adjustment

8. The court's interpretation of Festus Ordinance Sec. 31–92 as applied in this case is unconvincing. As a matter of policy "the law favors the free and unrestricted use of property." *Roberts v. Hagen,* 908 S.W.2d 819, 820 (Mo.App. E.D.1995). One of the primary rules of statutory construction in Missouri is that zoning ordinances, being in derogation of common law property rights, should, whenever ambiguous, be construed strictly in favor of the property owner. *City of Louisiana v. Branham,* 969 S.W.2d 332, 338 (Mo.App. E.D. 1998).

who testified, Mr. James Sago, was that under Festus ordinances a CUP was, absent non-compliance with the originally stipulated conditions, binding and permanent once granted, with no time limit. This is consistent with the general common law; see 83 Am Jur.2d *Zoning and Planning* Section 959 at 803, supra. Mr. Sago also stated, unequivocally, that he was aware of no violations *and that the Board of Adjustment had never modified or revoked Appellant's CUP.*

It is thus clear that Appellant *still* has the CUP; the City is simply not honoring it. He has a pre-existing, authorized conditional use. The Board of Adjustment was aware, when they granted Appellant this conditional use in 1979, that the area to the south was zoned R–1 and had the potential for residential development; they granted him the CUP nonetheless. He has a vested right to continue the operation of his business, as long as he conforms to the original conditions of the CUP. *Ford Leasing,* 718 S.W.2d at 232.

■■■ Second, as applied here, the trial court's interpretation of Festus Ordinance Section 31–92 would be confiscatory and result in what amounted to a taking of Appellant's property without compensation. To so drastically change the required conditions of the CUP, in a way that effectively made it impossible for Appellant to continue using the business property for the purpose for which the CUP was originally granted,[9] would be equivalent to a violation of the nonconforming use doctrine. For it has been stated by our courts:

> Manifestly, where a person is lawfully conducting a business in a certain area, he has a vested right to continue, even though such business has become, by reason of changed zoning, a nonconforming use. To then say that the city, by

the simple expedient of first requiring then denying him a license, could destroy such vested right and put him out of business, would be absurd and unreasonable. Such is not the law.

*State ex rel. Keeven v. City of Hazelwood,* 585 S.W.2d 557, 560 (Mo.App. E.D.1979), quoting *State ex rel. Capps v. Bruns,* 353 S.W.2d 829, 831 (Mo.App. K.C. Dist 1962). Such strict protection of prior established nonconforming uses is constitutionally required, in order to avoid the constitutional prohibition against taking of private property without compensation. *State ex rel. Nealy v. Cole,* 442 S.W.2d at 131.

For all of the foregoing reasons, to the extent that the trial court's judgment was based on its above-quoted interpretation and application of Festus Ordinance Section 31–92, what we have referred to for short as the "living ordinance" theory, the court erred as a matter of law.

*(2) The "Changed Use" Theory*

■■ The other theory that the City has relied on in this action, as noted earlier, is that by the time the City denied renewal of Appellant's City Business License in mid–1994, the nature of his business use at the 1601 Horine Road property had changed from that of auto sales/service to that of operating a junk yard. If this claim were correct then the City would be entitled to injunctive relief, since requiring a sight-proof barrier around a junk yard is reasonable and, further, Appellant' s CUP does not authorize him to use the property as a junk yard. The trial court initially indicated, at the summary judgment hearing, that this question was to be the main issue at trial. However, the City offered little actual testimony and evidence at trial specifically addressing that issue; and nowhere in the trial court's judgment does it ever explicitly find or state that the nature of Appellant's business operation has in

---

9. The City's demand that Appellant erect a sight-proof fence would make it impossible for Appellant to maintain a state automobile dealer's license for his property, since state law requires that an automobile dealer's dis-

play lot must provide "unencumbered visibility from the nearest public street of the motor vehicles being sold" by the dealer. See 12 CSR 60–2.120.

fact changed from what it was before to something else. Nevertheless, because this is a court-tried case and neither party requested findings of fact or conclusions of law, we must assume that this fact issue was resolved against Appellant, and that the trial court indeed found that the character of Appellant's business operation had changed from auto sales and service to something that in substance was a junk yard. Rule 73.01(a)(3).

That finding was in error because, even when viewed in the light most favorable to the verdict, there was no substantial evidence to support it.[10] Whether under the narrow definition of "junk yard" as contained in the Code Book of the Festus City ordinances, or by any other reasonable construction of that term, the City didn't offer any testimony to prove this claim. The testimony and trial exhibits, including among others the photographic exhibits offered by both sides, show that the basic nature of Appellant's business has remained unchanged over the years, and that Appellant has continued to buy mostly dilapidated or wrecked but restorable antique and classic cars, then restore some of them to be sold per customer orders, and sell others in an unrestored stage to customers who then did their own restoration work on the vehicles. There has been no change in the age, type or condition of the cars sold, or the method of Appellant's business operation. The evidence established that only about 40 cars were on the lot at the time of trial, not a significant difference from the past history of operation. Thus, there was no evidence of any "changed use" of the property by Appellant such that his operation had become a "junk yard," or of any other fundamental change in the nature of his business operation.

There was evidence of a significant drop in Appellant's volume of sales, starting in 1993, and then continuing on from mid–1994 after he lost his City Business License and then his state dealer's license. As Appellant himself admitted at trial, this is the one significant difference in his business operation compared to what it was before. Because he no longer has a state dealer's license, he is basically limited to selling no more than six cars per year. See § 301.570.1 RSMo. Cum.Supp. 1998. The City then argues that this reduced volume of sales and business activity shows that Appellant's use of the property has fundamentally changed in character. We disagree. The reduced volume of sales does not *per se* go to the fundamental nature of a business. Without more, a mere reduction——even a substantial reduction——in sales and service activity cannot reasonably be used as a basis to re-characterize a business from auto sales and service to junk yard.

The dissent finds evidence of "changed use" from the fact that when Appellant first began his business in 1979 he only had eight antique and classic vehicles on the property, whereas by the time of trial he estimated the total number of vehicles was approximately forty, and that Appellant acknowledged at trial that for the past few years he had accumulated slightly more vehicles than he had sold. Similarly, the dissent notes that the vehicles were not obscured from the view of neighbors, at least one of whom complained that the vehicles were unsightly in their pre-restoration stage. This overlooks the fact that temporary excess inventory is not an unusual condition for any business (assuming arguendo that forty vehicles could somehow be deemed "excessive"), and further overlooks the fact that it *always* has been an inherent part of Appellant's business that the "project-status" vehicles he pur-

---

**10.** In determining whether there is substantial evidence to support the verdict, we view the evidence in the light most favorable to the prevailing party and give him or her the benefit of all reasonable favorable inferences to be drawn therefrom. *Steward v. Goetz,* 945 S.W.2d 520, 528 (Mo.App. E.D.1997). However, we "do not supply missing evidence, or give the plaintiff the benefit of unreasonable, speculative or forced inferences." *Id.*

chases and sells are typically unattractive in their unrestored stage. The dissent cannot point to a condition that has been violated. Appellant was granted a CUP for the buying and selling of antique/classic autos, and the outdoor storage and servicing of same. Just as it is clear from the record that a sight-proof fence was never a condition of the CUP, so too there is nothing in the record to support that the Board of Adjustment established a specific numerical limit of vehicles as a condition of the CUP, or that the vehicles' esthetic appearance was made a condition of the CUP.

The City's "changed use" theory is unsupported by any substantial evidence; accordingly, the trial court erred in holding that the fundamental nature of Appellant's business operation had changed from auto sales/service to either a junk yard or salvage facility.

### B. *Licensure Case*

(3) *The Court's Injunction Concerning City and State Licensure*

■ In addition to its claim that Appellant was in violation of **zoning** ordinances for failing to comply with the conditions of his CUP, the City's injunction action against Appellant claimed that he was doing business without proper city or state **business licensure**, and asked for injunctive relief on that basis as well. In accordance with Rule 73.01(a)(3), we must assume that the court enjoined Appellant in part due to the fact that he did not have a city or state license. Appellant argues that he did not have these licenses because the City acted in an arbitrary, unreasonable and unlawful manner. We agree.

■ With respect to Appellant's City Business License, the record reflects that the only reason cited by the City of Festus for declining to renew the license was his refusal to erect a sight-proof fence. But as we have previously discussed in this opinion, the City had no lawful basis for requiring that he erect such a fence. The City may not arbitrarily and illegally deny Appellant a City Business License, then go into a court of equity and seek to enjoin his business operation on the ground that he doesn't have such a license. Further, Appellant filed an equitable counterclaim in this matter, requesting an injunction for a City Business License to issue. The trial court erred in failing to grant that request. Once a court of equity has acquired jurisdiction of a cause, it will retain jurisdiction until it has administered full and complete justice between the parties within the scope of the pleadings and the evidence. *Craig v. Jo B. Gardner*, 586 S.W.2d 316, 325 (Mo. banc 1979). Here, justice and equity require that the City of Festus immediately issue Appellant a City Business License.

■ Similarly, with respect to *state* licensure, the record reflects that the City, acting through its police chief, caused Appellant to lose his state dealer's license. An applicant for state dealership license renewal must show on his application that he meets the statutorily defined criteria for having a "bona fide established place of business;" this must be certified to by an authorized member of the municipal police department or a member of the local state highway patrol troop. See § 301.560.1(1) RSMo. The record supports Appellant's contention that the Festus Chief of Police caused the rejection of his state dealer's license in late 1994, by improperly refusing to certify on the renewal application form that Appellant's property met the criteria for "bona fide established place of business" when in fact it did. Just as with the City Business License, the City may not arbitrarily cause Appellant to lose the state dealer's license, then complain in a court of equity that he doesn't have one.

At the same time, the record does not reflect that Appellant filed a counterclaim in this action seeking to require the issuance of a *state* motor vehicle dealer's license; nor has the Respondent

acknowledged such.[11] We therefore do not address the question of whether he was entitled to bring such a claim. However, if Appellant were to reapply for a state dealer's license in the future, it is the Department of Revenue and the Missouri Motor Vehicle Commission who will determine whether Appellant meets the eligibility criteria for such a license, pursuant to the application procedure provided for under §§ 301.550 RSMo, *et seq.*

(4) *Dismissal Of Appellant's Counterclaim For Damages*

Appellant contends the trial court erred in dismissing his counterclaim for damages for loss of business. The City argued at trial that dismissal of the counterclaim was required because Appellant did not exhaust his administrative remedies.

That contention is incorrect as a matter of law. The relevant language from the ordinances admitted at trial by the City relative to the City's exhaustion of administrative remedies argument reflect that, to the extent Appellant may have had an administrative remedy by way of appeal to the Board of Adjustment, this was an *optional* rather than a *mandatory* remedy. Because the ordinances did not require the Board of Adjustment to hear the peculiar type of appeal now before us, there was no jurisdictional barrier to the trial court's consideration of Appellant's counterclaim for damages based upon his failure to exhaust administrative remedies. See *Citizens For Waste Management v. St. Louis County*, 810 S.W.2d 635, 638 (Mo.App. E.D.1991). Additionally, exhaustion was not required because any such administrative process could not provide an adequate remedy for Appellant's economic damages resulting from the City's actions against him; see *Premium Farms Inc. v. Lincoln Township*, 946 S.W.2d 234, 237 (Mo. banc 1997). The trial court's dismissal of Appellant's counterclaim was error and is reversed.

11. See footnote 4, *supra.*

### Conclusion

Appellant's first point on appeal is denied. Point II is granted. The judgment of the trial court is reversed. Accordingly, the injunction and order that Appellant erect a sight-proof fence at his property are dissolved. The cause is remanded to the trial court with directions to: (1) enter an order enjoining the City of Festus to immediately grant Appellant a City Business License for his property as an auto sales and service operation; (2) reinstate Appellant's counterclaim for damages; and (3) for further proceedings consistent with this opinion.

LAWRENCE E. MOONEY, J., concurs.

CLIFFORD H. AHRENS, J., dissents in separate dissenting opinion.

**CLIFFORD H. AHRENS, Judge, dissenting.**

I respectfully dissent.

I disagree with the majority's decision that the record lacked sufficient evidence to prove a "changed use" of appellant's property. The critical issue at trial was whether the nature of appellant's property had changed so that it no longer complied with the conditional use permit. The conditional use permit provided for outdoor servicing and storage of vehicles customary to the motor vehicle sales and servicing business. I believe there was substantial evidence to support the trial court's judgment that appellant had violated the conditional use permit by retaining an excessive number of inert and non-mobile automobiles.

This court is to view the evidence in the light most favorable to the trial court's judgment. *Champion v. Frazier*, 977 S.W.2d 61, 62 (Mo.App.1998). Appellant testified that he was accumulating more cars than he could sell. Appellant also testified that in 1979, when the conditional use permit was issued, he had eight vehi-

cles stored on the property, all of which were obscured from view. However, in the 1990's, that number began increasing, and by the time of trial, appellant estimated that forty vehicles were stored upon the property. These vehicles were clearly visible from the street, and at least one neighbor had complained of their unsightliness. The deputy building commissioner testified that tree saplings and weeds were growing through the vehicles and the base of one vehicle had been rusted out. A majority of these vehicles were non-functioning. Substantial evidence supports the trial court's ruling that there was a changed use of the property and appellant's business no longer conformed to the requirements of the conditional use permit.

The majority concedes that a conditional use permit remains in effect until its provisions are violated. *See also* 83 Am.Jur.2d *Zoning and Planning*, section 959 at 803 (1992). The majority also concedes that a municipality seeking to revoke a conditional use permit has the burden of proving the basis for revocation of that permit. *Nigh v. City of Savannah*, 956 S.W.2d 451, 453 (Mo.App.1997). In my opinion, the respondent has met this burden by proving that the nature of the property has changed. The trial court did not err in terminating the conditional use permit.

On the issue of state licensure, the majority opinion acknowledges that the record does not reflect the nature of appellant's claim. Notwithstanding the lack of a record, the majority goes on to determine that the City caused appellant to lose his state dealer's license by improperly refusing to certify appellant met the statutory criteria. I believe we do not have jurisdiction to decide this issue.

A motor vehicle dealer must seek certification that his established place of business is bona fide. Section 301.560.1(1) RSMo (Supp.1998). A police officer must certify the application, guaranteeing that it complies with the requirements dictated in section 301.560.1(1). *Id.* If the license holder has failed to establish or maintain a bona fide place of business, the department of motor vehicles may refuse to renew the license. Section 301.562.1 RSMo (Supp.1998). The licensee shall have the right to appeal the decision of the department in the manner provided in chapter 536 RSMo. Section 301.562.3 RSMo (Supp. 1998). Proceedings for review may be instituted by filing a petition in the circuit court of proper venue within thirty days after the mailing or delivery of the notice of the agency's final decision. Section 536.110.1 RSMo (1994).

On November 29, 1994, appellant's state motor vehicle dealer's license was "disapproved" by a local police officer. The disapproving officer never indicated the reasons for denying certification. On December 7, 1994, the Motor Vehicle Commission sent a notice to appellant, explaining that he needed to obtain certification by a qualified police officer on his application. The notice also required appellant to make four more motor vehicle sales in order to renew for 1995. Based upon the record, it appears appellant took no further action and simply let his license lapse without contesting or appealing the Commission's decision.

Appellant never filed a petition for review. He merely challenged the denial of the license three years later. Failing to timely file the petition for review deprives the circuit court of jurisdiction. *State ex rel. Director of Revenue, State of Mo. v. Rauch*, 971 S.W.2d 350, 353 (Mo.App. 1998). When the court lacks subject matter jurisdiction, the court can do nothing more than exercise its inherent power to dismiss. *Id.* As such, we do not have jurisdiction, nor did the circuit court have jurisdiction, to resolve this issue.

Moreover, even if we had subject matter jurisdiction, none of the entities rejecting the license, namely the state, the Department of Revenue, or the Motor Vehicle Commission, were joined as parties to these proceedings. The failure to join an indispensable party to litigation is so fun-

damental and jurisdictional as to require its consideration by this court whether raised by the parties or not. *Steiner v. Vatterott,* 973 S.W.2d 191, 194 (Mo.App. 1998). Since no arm of the state was joined as a party, we cannot assert jurisdiction over the state's denial of the motor vehicle dealer's license.

Finally, I believe we do not have jurisdiction to require the City of Festus to issue appellant a City Business License. Nor should the City of Festus be liable to appellant on his counterclaim for damages for the denial of that license.

Section 31–90 of the City Code of Festus states, in part,

> [t]he appeals to the Board of Adjustment may be taken by any person aggrieved ... by any decision of the building inspector. Such appeal shall be taken within a reasonable time, as provided by the rules of the board, by filing with the building inspector and with the board a notice of appeal specifying the grounds thereof.

The majority reads this provision as providing for an optional remedy, rather than a mandatory remedy, with the Board of Adjustment and allowing for attack in the present case. I disagree. The decision to appeal may be optional; however, the means of appeal are mandatory and exclusively delineated in the city code.

Appellant's City Business License was denied on January 16, 1995. Immediately thereafter, he requested an "informal" meeting with the Board of Adjustment so they could "define their position." The Board wrote back, indicating their policy against informal meetings and suggesting that appellant contact City Hall to begin formal application procedures. Appellant neither began formal procedures nor filed a notice of appeal with the Board of Adjustment. Instead, he raised the issue three years later in the counterclaim in this case. It is a well settled principle of law that administrative procedures must be exhausted before other relief may be

granted. *Lewis v. Roskin,* 823 S.W.2d 152, 154 (Mo.App.1992). Consequently, we do not have jurisdiction to grant additional relief. The trial court did not err in dismissing appellant's counterclaims seeking an injunction requiring issuance of a City Business License and concomitant damages.

I would affirm the judgment of the trial court.